JASON S. HARTLEY (SBN# 192514)
JASON M. LINDNER (SBN# 211451)
STUEVE SIEGEL HANSON LLP
550 West C Street, Suite 610
San Diego, CA 92101
Tel: 619-400-5822 Fax: 619-400-5832

NORMAN E. SIEGEL (*pro hac vice forthcoming*)
STUEVE SIEGEL HANSON LLP
460 Nichols Road, Ste. 200
Kansas City, Missouri 64112
Tel:    816-714-7100 Fax:    816-714-7101

*Attorneys for Plaintiff Kenneth Stockman and the Proposed Class*
*(Additional Counsel on Signature Page)*

FILED

2011 APR 22  PM 3: 17

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

BY ___

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENNETH STOCKMAN, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br>v.<br><br>CORINTHIAN COLLEGES, INC., CORINTHIAN SCHOOLS, INC, ,<br><br>Defendants. | Case No.   **CV11-03467 AHM (AJWx)**<br><br>**CLASS ACTION COMPLAINT** |

Plaintiff Kenneth Stockman, individually and on behalf of the proposed Class, by and through their counsel, for their Complaint against Corinthian Colleges, Inc. and Corinthian Schools, Inc. (collectively, "Corinthian" or "Defendants") hereby states and alleges as follows:

## JURISDICTION

1.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. §1332 (d)(2)(A), because the action is a proposed class action for which minimal diversity exists and the amount in controversy collectively exceeds $5,000,000.00, exclusive of interests and costs.

2.      Venue in this District is proper under 28 U.S.C. § 1391(b) because Defendants reside in this District, at all relevant times have done business in this District, and the transactions at issue in this Complaint occurred in this District.  Plaintiff attended a school owned and operated by Defendants located in Reseda, California, in the District in which this Court sits.

-1-

COMPLAINT FOR CIVIL DAMAGES AND EQUITABLE RELIEF

## THE PARTIES

3.      Plaintiff Kenneth Stockman is a resident of New Smyrna Beach, Florida.  From January 2009 to October 2009, he was enrolled in a program at an Everest College campus owned and operated by Defendants located in Reseda, California.  Plaintiff Stockman paid or incurred debt of over $13,000, plus interest, for Everest College tuition and fees.

4.      Defendant Corinthian Colleges, Inc. is a Delaware corporation with its principal place of business located at 6 Hutton Centre Drive, Suite 400, Santa Ana, California.  It describes itself as "one of the largest for-profit post-secondary education companies in the United States and Canada[.]"[1]  According to its most recent annual 10-K report, as of June 30, 2010, 110,580 students were enrolled at one of Corinthian's 101 school campuses in the United States.  Corinthian derives approximately 89.8% of its net U.S. revenue from funds issued by federal Title IV student assistance programs.[2] The company has generated substantial revenues and profits from its Everest College campuses (collectively "Everest"), at the expense of Plaintiff and the members of the Class.  Corinthian's tuition rates, which are higher than similar programs offered by public institutions such as community colleges, range from $7,250 to $36,100, depending on the nature and length of the program.[3]

5.      Defendant Corinthian Schools, Inc. is a Delaware corporation with its principal place of business located at 6 Hutton Centre Drive, Suite 400, Santa Ana, California.  Corinthian Schools, Inc. is a wholly-owned subsidiary of Corinthian Colleges, Inc. and does now, and at all relevant times did, business in California under the name Everest College, among other fictitious business names.

6.      Defendants operate approximately 100 schools located in 25 United States jurisdictions, and an internet-based operation offering on-line programs similar to those at its

---

[1] *See* Corinthian Colleges, Inc. Annual Report, Form 10-K at p. 2 (August 23, 2010) ("Annual Report") (available at
http://secfilings.com/searchresultswide.aspx?TabIndex=2&FilingID=7427035&type=convpdf&companyid=705&ppu=%2fdefault.aspx%3fticker%3dCOCO%26amp%3bformgroupid%3d1%26amp%3bauth%3d1).
[2] *Id.* at 14.
[3] *See id.* at 9-10.

COMPLAINT FOR CIVIL DAMAGES AND EQUITABLE RELIEF

7.     traditional brick-and-mortar schools.  Defendants operate over 25 college campuses in the state of California, including 14 Everest campuses.

## NATURE OF ACTION

8.     This class action is filed by and on behalf of students of Everest College campuses owned and operated by Defendants.

9.     Corinthian fails to disclose to its students material facts regarding Everest. Specifically, Corinthian fails to disclose that its "accreditation" is not recognized by most public and non-profit schools in California and across the nation.  Students who enroll at Everest learn only after-the-fact that the credits they have earned at Everest cannot be transferred to other schools where they hope to complete or further their education.  If the true status of accreditation was disclosed at the outset, Plaintiff would not have enrolled in Everest.

10.     Further, Defendants have an ongoing policy and practice of misrepresenting statistics regarding the rate of placement and the employability of Everest graduates to its potential students.

11.     Through their failure to disclose material facts and their policy of misrepresentation, Defendants have induced Plaintiff and members of the Class to enroll in an Everest program. Contrary to Everest's statements, Plaintiff cannot find employment in his field of study, or transfer his credits to most four-year universities, or use his degree elsewhere to obtain the benefits promised by Everest during the advertising and recruiting process.

## FACTUAL ALLEGATIONS

**I.     Defendants Fail To Disclose Material Facts Regarding Their Accreditation**

12.     Everest advertises itself as a "career training" and "life skills" college.  Students may enroll in certificate or associate's degree programs in various broad "career" categories such as business, medical administrative assisting, medical insurance billing and coding, pharmacy technology, and surgical technology.  The school also has a limited bachelor degree program. Defendants have publicly noted that the Everest brand appeals to "low-income and minority students" who consider Everest "the door to future career training for many people who need it urgently."  For many Everest students, the career college is the first exposure to the world of post-

COMPLAINT FOR CIVIL DAMAGES AND EQUITABLE RELIEF

1    secondary education, and the students often plan to transfer credits earned at Everest to other

2    institutions of higher education where they can further or complete their education.

3        13.    A crucial fact for such students is whether the credits they earn at Everest actually can

4    be transferred to other schools.  Whether such credits will be accepted by a transferee school

5    depends primarily and heavily upon the transferring school's accreditation.

6        14.    There are two types of accreditation:  regional and national accreditation.  The

7    distinction between regional and national accreditation has a direct impact on the transferability of

8    credits earned at Everest, and transferability of credits is something that is crucial to prospective

9    students.  Most prospective students are unaware of the distinction or the importance of the

10   distinction between regional and national accreditation, and the ultimate value it confers upon

11   credits, certificates, diplomas, or degrees earned at educational institutions.  Defendants fail to

12   explain or disclose these differences.

13       15.    Most public or non-profit colleges will only accept credits for transfer if those credits

14   were earned at a school that is regionally accredited.  Regional accreditation[4] is the type of

15   accreditation that is recognized and required as a condition of credit acceptance by most public or

16   non-profit post-secondary institutions across the country.  Regionally accredited institutions have

17   similar education and curriculum standards, and, thus, classes taken and degrees earned at one

18   regionally accredited school will generally be recognized at another regionally accredited school

19   across the country.

20       16.    National accrediting bodies are different.  They are specialized accrediting bodies that

21   evaluate unique institutions such as trade and technical colleges, "career colleges" or universities,

22   and colleges that seek accreditation for their affiliation with a certain religious body.

23       17.    Everest College's Reseda campus is nationally accredited not regionally accredited.

24   In fact, all but two of Defendants' 101 campuses are nationally accredited by either the ACCSC, or

25   ───────────────

26   [4] There are six regional associations that provide institutional accreditation and that are named after the
regions in which they operate (Middle States, New England, North Central, Northwest, Southern, and
Western).  These regional associations cooperate extensively and acknowledge one another's accreditation.

27   The Western Association that accredits schools within Everest's region establishes close relationships
between many other colleges and secondary schools of the region.  The accrediting agencies include the
Western Association of Schools and Colleges' Accrediting Commission of Senior Colleges and

28   Universities, and the Accrediting Commission for Community and Junior Colleges.

COMPLAINT FOR CIVIL DAMAGES AND EQUITABLE RELIEF

1  the Accrediting Council for Independent Colleges and Schools.  Neither of the two regionally

2  accredited campuses are located in California.[5]

3    18.    Defendants know that because their Everest colleges are not regionally accredited,

4  credits earned at Everest will likely not be accepted for transfer in any public and private regionally

5  accredited schools in Southern California, or across the United States.  Defendants, however, do not

6  make prospective students aware of the distinction.

7    19.    On their website, the only time Defendants make *any* textual distinction between

8  regional and national accreditation is to assure students that Everest gladly "*accepts* appropriate

9  credits transferred from regionally or nationally accredited institutions" (emphasis added)

10    20.    Otherwise, a prospective student looking for information regarding Everest's

11  accreditation is directed to a multiplicity of assurances regarding accreditation on Defendants'

12  website.  Defendants describe their accreditation as "an asset that speaks to the high quality of its

13  educational programs."

14    21.    Underneath a tab entitled "Why Everest?" Defendants invite students to "learn how

15  our campuses are accredited-and can benefit you."  The website states that Everest is "proud of our

16  accreditation *because it sets us apart.*  It's an accreditation that *shows the strength of our academic*

17

18

19  [5] The Phoenix, Arizona campus and its Mesa, Arizona branch campus are accredited by the Higher
Learning Commission ("HLC").  Both campuses and the school's online division are in jeopardy of

20  losing accreditation due to its repeated failure to meet the HLC accreditation standards for several years.
The school's accreditation was put on probation in May 2009, after ongoing concerns that:  i) the

21  school's "governance model does not provide the necessary autonomy for the College to make
educational and academic decisions for the College independent of the Corinthian corporate structure;"

22  ii) the school "lacks sufficient operational and academic control over its Mesa, Arizona branch campus
and Online Division;" and iii) the school "lacks full responsibility for, and control of, its own curriculum
and degree offerings as well as those provided by its Mesa Campus and its Online division." *See* HLC

23  Public Disclosure Notice on Everest College-Phoenix (2009) (no longer available electronically); *see
also* HLC Order to Show Cause, Everest-Phoenix (November 5, 2010) (available at

24  http://www.ncahlc.org/download/PublicDisclosureNotices/PDN_2085.pdf)    (discussing    findings);
Corinthian Colleges, Inc., Form 8-K (November 15, 2010) (discussing findings).  After a year of

25  probation, the HLC conducted an on-site investigation to determine whether probation should be lifted,
and found that there were still very serious concerns.  In a report issued in connection with the
investigation, the HLC characterized the school's acts of federal financial aid misrepresentation as a

26  "breach of fiduciary duty" and "intentional evasion" of certain Title IV program requirements.  *See*
Corinthian Colleges, Inc., Quarterly Report, Form 10-Q, at p. 21 (August 23, 2010) (discussing

27  findings).  Accordingly, on November 4, 2010, the HLC issued an Order to Show-Cause as to why the
schools' accreditation should not be withdrawn, and the school must prove within one year that it meets
the    criteria    for    accreditation    or    its    accreditation    will    be    withdrawn.    *See*

28  HLC Order. *See* HLC Order to Show Cause, Everest-Phoenix (November 5, 2010) (hyperlink above).

COMPLAINT FOR CIVIL DAMAGES AND EQUITABLE RELIEF

1  *programs*" (emphasis added).  Students must then click on a specific campus to get access to its

2  individual accreditation information.

3       22.     On every Everest College campus' accreditation tab, Defendant states that

4  "[a]ccreditation means that Everest has met or surpassed the standards for educational quality," that

5  accreditation means that Everest "[i]s recognized as a qualified institution of higher learning," and

6  that "Everest trains people for real careers in fields with high rates of employment.  And each

7  campus is accredited."  At no point does this description disclose Everest's lack of regional

8  accreditation.

9       23.     For further emphasis, Defendants also tell students that "each Everest school is

10  accredited by an agency recognized by the U.S. Department of Education and is recognized by the

11  Council for Higher Education Accreditation."  Defendants do not disclose that this recognition only

12  means that students attending the campus may be able to receive federal loans and grants.

13       24.     Defendants' website discloses absolutely nothing about the distinctions between the

14  regional, national, and specialized accreditation that directly impact a student's ability to use the

15  credits and degrees obtained at Everest at other colleges, and to obtain a job after graduation.

16  Defendants' website does not disclose that their credits, certifications, and degrees are given no

17  recognition at almost all the regionally accredited institutions both within and outside of California,

18  or that credits earned at Everest cannot be transferred to those institutions.

19       25.     Indeed, ACCSC Executive director Michale McComis testified at a Senate hearing

20  that a prospective student would have to "dig" in order to figure out the significance of varying

21  accreditations for a given for-profit college like Everest, because the information is not readily

22  available.[6]

23       26.     Defendants' carefully worded discussion of Everest College accreditation is limited to

24  the general fact that it has received recognition by an accrediting agency.  Unbeknownst to

25  prospective students, the accrediting agency itself and type of accreditation it bestows on a school is

26  far more relevant and material to the actual value of Everest's certificates and degrees:  it has a direct

27

28  [6] Statements of Michale McComis, Executive Director of ACCSC at the Second HELP Committee Hearing.

COMPLAINT FOR CIVIL DAMAGES AND EQUITABLE RELIEF

1  bearing on whether students can transfer the credits earned at Everest to other institutions, in the
2  pursuit of other degrees.

3        27.     Even the descriptions of Defendant's Everest College programs suggest that
4  prospective students can use an Everest diploma or degree to attain more prestigious degrees
5  elsewhere in what Everest describes as "legal," "criminal justice," or "accounting" studies. For
6  example, in a video clip on Defendants' website, Defendants indicate that students enrolled in
7  Everest's criminal justice program can "go on to become" a social worker with a criminal justice
8  diploma or degree. Defendants fail to tell students that a bachelor's or master's degree in social
9  work is required to become a social worker, a program that Everest does not offer, or that Everest's
10 criminal justice credits will probably not be accepted by a university that actually offers a bachelor's
11 or master's degree in social work.

12        28.     In another video on the website, Defendants imply that completing Everest's "legal"
13 program is a stepping stone to becoming a practicing lawyer. In the video, a teacher in the "legal"
14 program discloses that some of his "proudest moments occur" when he sees students go on to
15 "become lawyers." Defendants fail to tell prospective students that the credits earned in their "legal"
16 program will probably not be accepted toward obtaining a bachelor's degree at a regionally
17 accredited school, much less accepted at a law school, and therefore are not an asset in obtaining the
18 *juris doctorate* that is required to sit the bar and practice law in California —another program
19 Everest does not offer.

20        29.     Defendant Corinthian recently acquired a new college brand known as Heald College.
21 The January 5, 2010 acquisition of the Heald College brand was especially significant to Corinthian
22 because the Heald campuses are and have been regionally accredited, and have been offering career-
23 based academic programs since 1863. But, notably, Everest College credits are not even
24 transferable to commonly-owned Heald Colleges.

25        30.     In short, Defendants' website fails to disclose the significance of Everest's lack of
26 regional accreditation to prospective students, and misleads students into believing that Everest
27 College national accreditation is more valuable than it really is.

28

COMPLAINT FOR CIVIL DAMAGES AND EQUITABLE RELIEF

31.     Plaintiff, and other members of the Class, were not aware of Everest's lack of regional accreditation, and due to Defendants' failure to disclose these material facts, were induced into purchasing tuition to attend Everest.

**II.     Defendants' Policy of Misrepresentation**

32.     Defendants designed, planned, and implemented a broad and deliberate scheme of misrepresenting and concealing material facts related to the actual value of their educational programs in a concerted effort to induce student enrollment. These misrepresentations begin with their advertisements, continue during telephone and face-to-face meetings with admissions and financial aid representatives, and end when the student is induced to sign an enrollment agreement ("Enrollment Agreement") and applications for tens-of-thousands of dollars in student loans.

33.     According to the advertisements on Defendants' website, Everest graduates enjoy a high rate of career success due to the allegedly well-recognized, satisfactory or even superior quality of Everest's career-oriented programs. Some of the statements include:

- "Everest grads have a bright career outlook. Click on the 'Go' button to get started on your career training."

- "Employers hire Everest graduates because they recognize the quality of the training we provide. They understand that our graduates have the kind of career training it takes to succeed in their chosen profession."

- "The majority of our graduates begin their careers within a few months of graduating—because we train them with skills that are current and desired by employers."

34.     As a career college, Corinthian is expected to place a certain percentage of its graduates for initial and continued participation in Title IV lending programs—from which Defendants receive nearly 90% of their revenue.

COMPLAINT FOR CIVIL DAMAGES AND EQUITABLE RELIEF

35.     The rules are orchestrated by the United States Department of Education, and also implemented by the State of California, other jurisdictions, and federally-recognized institutional accrediting agencies.  Defendants calculate their placement rates on a yearly basis, and the rates are largely self-reported to the government, states, and accrediting agencies.

36.     Accrediting agencies for "career colleges" like Everest base their standards heavily upon the provision of career-oriented instruction, and tangible results.  For example, the Accrediting Commission of Career Colleges and Schools (the "ACCSC"), which accredits Everest's Reseda campus and many other Everest College campuses, requires that a school's primary educational objective should be to "prepare students for entrance or advancement in one or more occupations requiring technical or career oriented competencies and skills."[7]  Compliance is measured by the school's self-reported graduation and job placement rates.

37.     The new California Private Post-Secondary Education Act of 2009 ("PSE") also requires institutions like Everest to submit job placement data to the Bureau for Post-Secondary Education and currently requires Everest to provide the data to prospective students during the enrollment process.  Many other states have similar periodic reporting requirements.

38.     Despite the routine reporting of placement rate information to the federal government, states, and accrediting agencies like the ACCSC, Defendants' website contains no information regarding the actual placement rates of Everest graduates.  Instead, a prospective student looking for placement rates will find an obscure directive to meet with the "Campus President," under an unrelated "accreditation" tab.

39.     Students who contact an Everest campus are set up with an admissions representative so that the student can get more information on programs and costs.  Everest's representatives are required by policy to call the leads multiple times a day until the prospective student agrees to come to the school and meet with the representative—or affirmatively instructs the representative to stop calling.  In fact, admissions representatives are required to make hundreds of phone calls a day to

---

[7] *See* ACCSC *Standards of Accreditation,* (available at http://www.accsc.org/Content/Accreditation/index.asp).

COMPLAINT FOR CIVIL DAMAGES AND EQUITABLE RELIEF

prospective student leads.   Defendants employ a system of established sales methods (the "System") to disseminate, teach, and enforce uniform, scripted sales tactics on a nation-wide basis, at each and every Everest College campus.  Campus admissions directors monitor the system daily by listening in on phone calls, observing admissions interviews, and organizing activities and games to test employee knowledge of the System.  Admissions directors are supervised by campus presidents, and all campuses are supervised by regional directors.  Everest College policies are conceived and disseminated through a single centralized "campus support center."

40.   The System teaches admissions representatives and other front-line employees how to take advantage of prospective students and maximize student enrollment in Defendants' programs, or what Defendants term  "closing a sale."  In turn, admissions representatives' salaries, and their job security, are deeply affected by the amount of students each enrolls.  Admissions representatives' salary increases are determined by the amount of students they enroll.  If they do not meet a minimum enrollment quota they are subject to termination.

41.   At the outset, Everest College policy is that any prospective student who contacts Everest for information about its programs becomes a "lead" and Everest's representatives are required by policy to call the leads multiple times a day until the prospective student agrees to come to the school and meet with the representative—or affirmatively instructs the representative to stop calling.  In fact, admissions representatives are required to make hundreds of phone calls a day to prospective student leads.

42.   Once the representative meets with the student, the student is intentionally never left alone, and kept under high pressure to apply to the school.  Every step of the process is orchestrated by Defendant, and includes scheduled "hand-offs" and scripted conversations between various Everest actors in the presence of the unsuspecting prospective student.

43.   Defendants' techniques are driven by a stereotype of underprivileged and uneducated prospective students called "Generation Y."[8]  Everest College Representatives use a combination of "power words" and negativity to tap into the stereotyped emotions about a prospect's lack of career

---

[8] Testimony of Terri Evans, *Steed v. Rhodes College, Inc. et al.*, American Arbitration Association, Case No. 71 434 E 00885-09 01 SIM (January 10, 2011) (hereinafter "Evans Testimony")..

COMPLAINT FOR CIVIL DAMAGES AND EQUITABLE RELIEF

1  or academic achievement.[9] This includes getting the students to "wallow in their grief, feel that pain

2  of having accomplished nothing in life, and then use that pain" to pressure them to enroll.[10]

3      44.  Representatives are taught to identify and exploit the prospective students' "hot

4  buttons," starting with the stereotypical desires of a Generation Y prospect.[11] Social acceptance,

5  respect, self-esteem, "better parenting," and recognition are among those targeted by admissions

6  representatives.[12] Representatives are taught to position themselves to influence student decisions,

7  and get students to rely and trust the representatives' promises and assurances for a better future by

8  enrolling.[13]

9      45.  Representatives are not taught to guide or counsel students in deciding whether

10  Everest College is right for them.[14] Rather, once a prospective student has met with an admissions

11  representative, the student is deemed an "assumptive sale" and the goal becomes to "get [the student]

12  to sign off on all the paperwork," and "close the sale."[15]

13      46.  The National Association for College Admissions Counseling (NACAC) describes

14  this sales interaction as "information asymmetry."[16] The encounter is "asymmetrical" because it is

15  between a student who believes he is getting education and career counseling and a salesman with a

16  personal financial stake in the student's enrollment.[17] Potential students "trust postsecondary

17  educational institutions and their admissions officers…and perceive the interactions as

18  counseling…[and not] sales and marketing…[because counseling] has historically been a prominent

19  part of ethical admission practices at American colleges and universities."[18]

20

21  _____

[9] Declaration of Shayler White, *Miller v. Corinthian Colleges et al.*. United States District Court for the District of Utah, Case No. 2:10-CV-999 TS, Docket No. 16, Ex. A (November 9, 2010) (hereinafter "White Declaration").

[10] *Id.*

[11] Evans Testimony.

[12] *Id*

[13] *Id.*.

[14] *Id.*

[15] *Id.*

[16] Testimony of David Hawkins, *For Profit Schools:  The Student Recruitment Experience before the S. Comm. on Health Education Labor & Pensions*, 11th Cong. (2010) (hereinafter "Second HELP Committee Hearing") (video and audio accessible at: http://help.senate.gov/hearings/hearing/?id+19454102-5056-9502-5d44-e2aa8233ba5a); *see also* Testimony of Gregory Kutz before the HELP Committee, *For-Profit Colleges:  Undercover Testing Finds Colleges Encouraged Fraud and Engaged in Deceptive and Questionable Marketing Practices* (Aug. 4, 2010) (hereinafter "Undercover Report").

[17] *Id.*.

[18] *Id.*.

-11-
COMPLAINT FOR CIVIL DAMAGES AND EQUITABLE RELIEF

47.     Accordingly, students are unaware that there "may be cause to question what recruiters and advertisements are telling them… [w]hereas consumers may be prepared for a high-pressure sales pitch at a car dealership…or other commercial setting, few are aware that a college recruiter might employ the same tactics."[19] This trust enables recruiters to exploit a potential student's lack of awareness of the terms of the interaction.[20] This is especially the case for "non-traditional or underserved populations, who may be years removed from the structure of high school…often at the mercy of recruiters or admissions officers for guidance." [21]

48.     These inequities in the bargaining process occur at Everest because admissions representatives are motivated by commissions or other incentives such as the threat of termination or demotion to enroll students.  As a publicly-traded organization, Defendants must satisfy shareholders and constantly focus on growth increasing the number of enrolled students.

49.     To further that end, Defendants instruct representatives to quickly close the "sale" of enrollment, and to present conflicting written disclosures only after the students have signed an Enrollment Agreement.  The written disclosures waive job placement promises, promises of credit transferability, and the students' right to a jury trial or class litigation, among other things. Moreover, Defendants do not provide students with a copy of the disclosures at the time the Enrollment Agreement is signed or even during its cancellation and opt-out periods.  As result, students do not learn these material truths until after the cancellation period has expired, or indeed, until after they have graduated from Everest.

50.     Plaintiff and the proposed class members all met with Everest admissions representatives and were subject to these tactics prior to enrolling at Everest.  Defendants' established system encouraged the misrepresentation and omission of material information and further induced Plaintiff and the Class to purchase tuition at Everest.

51.     Defendants' policies and practices are intended to prevent students from discovering material information regarding the transferability of credits earned at Everest, and to mislead students regarding the school's real placement rates and the employability of Everest graduates.

---

[19] Id.
[20] Id.
[21] Id.

COMPLAINT FOR CIVIL DAMAGES AND EQUITABLE RELIEF

52.     Throughout the recruiting process, the student is intentionally never left alone, and instead kept under high pressure to apply to the school.[22]

53.     After receiving a commitment to enroll, the student completes the enrollment paperwork.

54.     The Enrollment Agreement requests personal information but also contains (in small font above the student signature) language that the student is agreeing to arbitrate his or her future potential claims against Corinthian and waiving his or her right to a jury trial.  This waiver is described at the end of a separate "addendum" to the Enrollment Agreement.

55.     First, the admissions representatives obtain the signatures of the students to enroll and waive their right to a jury trial.  After the signatures are obtained, the admissions representatives present and minimize the importance of the Addendum and Disclosures.  Moreover, as noted above, the admissions representative does not provide a copy of the Enrollment Agreement or its Addendum and Disclosures to the student after signing, nor is the student given an chance to take those documents away to copy on his or her own.

56.     During training and on a day-to-day basis, admissions representatives are trained and encouraged to provide false and misleading information to prospective students during the recruiting process such as inflated job placement numbers, misleading promises of large salaries and the possibility of employment after graduation, and false and misleading statements regarding whether students can transfer their credits elsewhere.

57.     For example, Plaintiff and other students enrolling in Everest's Medical Billing and Coding program at the Reseda campus are enticed to enroll by representations that an exceedingly large number of students are placed in the positions for which they are trained in positions that earn five figure salaries.  In fact, few students are employed as Medical Billing and Coding within a year after graduation, and an entry level job as a Medical Billing and Coding professional pays little more than $8.00 to $9.00 an hour.

58.     Everest admissions representatives also misrepresented job placement rates as a result of externships.  Everest promised Plaintiff and the class 30-day externships at the conclusion of

---

[22] White Declaration.

COMPLAINT FOR CIVIL DAMAGES AND EQUITABLE RELIEF

1  training, and told them that the majority of students received a job with the externship site. In fact,

2  as Everest well knew or should have known, the externship sites did not generally hire Everest

3  students, but instead continued to recycle Everest students as free help.

4      59.    Upon information and belief, Everest students across the country are similarly given

5  false and misleading information during the admissions interview, according to Defendants' policies,

6  about placement rates and the employability of graduates.

7      60.    If and when students ask questions relating to the transferability of credits to specific

8  regional universities and community colleges or indicate that they wish to continue their education

9  elsewhere, Everest representatives are not instructed to disclose the truth—which is that Everest's

10  credits are hardly recognized by any community colleges or universities in California or elsewhere.

11      61.    Rather, Everest representatives make false statements that students should have no

12  problem transferring credits, or that the transferability of credits is limited only by whether the

13  school offers and gives credence to the curriculum of a given course.

14      62.    Defendants do not train admissions representatives to truthfully answer material

15  questions or disclose material information about the accreditation of its campuses. Instead,

16  representatives are just trained that the school is "accredited." According to a former admissions

17  representative, "Everest never train[s] admissions representatives on the meanings and differences in

18  accreditation...I believed that Everest credits were transferable to other colleges...pending that the

19  University they were transferring to would accept the credits and told this to prospective students

20  when they asked."[23]

21      63.    Similarly, since Defendant Corinthian took over Heald College, it has encouraged

22  Heald admissions representatives to misleadingly describe Heald as a "sister college" of Everest

23  campuses when asked whether Heald recognizes Everest's credits. Heald admissions representatives

24  are instructed to provide the statement in response to direct questions about the transferability of

25  credits from Everest campuses to Heald, instead of the truth—that non-regionally accredited Everest

26  credits are not transferable to the regionally accredited "sister" program.

27

28

[23] White Declaration.

COMPLAINT FOR CIVIL DAMAGES AND EQUITABLE RELIEF

64.     This policy of misrepresentation and failure to disclose further induced Plaintiff and the Class to purchase tuition at Everest.

**III.     Specific Examples of Everest's False and Misleading Conduct**

65.     The class representative plaintiff, Kenneth Stockman, was a victim of Defendants' misrepresentations, similar to members of the Class.

66.     In or about January 2009, Plaintiff Kenneth Stockman was told by an Everest admissions representative and other Everest representatives that:

    a.     There was "massive recruitment" of Everest grads by employers generally and in and around Los Angeles, California;

    b.     "Hundreds" of students had obtained employment at reputed places like Grossman Burns Medical Center and UCLA Medical Center after finishing Everest's program;

    c.     Mr. Stockman could expect to make at least $50,000 a year when he graduated;

    d.     The Everest campus was "accredited."

67.     Plaintiff Stockman relied on Defendants' misrepresentations and employment promises in deciding to and enrolling in the program.  He would not have enrolled at Everest if he knew the truth about job placement and transfer of credits.

68.     Each of these representations was false or misleading and constituted false or misleading or fraudulent practices in violation of California law. Plaintiff Stockman graduated in October 2009 and was not hired by his externship site.  Stockman asked for the contacts at UCLA, Grossman and other institutions where he was told hundreds of Everest students had been placed the prior year, but was told he had been misinformed.  Stockman contacted UCLA and Grossman but UCLA rejected Stockman citing lack of actual experience, and Grossman did not respond.

69.     Stockman remains unemployed and has over $13,000 in student loan debt from his time at Everest.

**IV.     The GAO Findings**

70.     This pattern of conduct was the subject of hearings conducted by the United States Senate Committee on Health, Labor & Pensions ("HELP Committee") which began on June 4, 2010, in an effort to address various alleged patterns of misconduct by for-profit colleges such as

-15-
COMPLAINT FOR CIVIL DAMAGES AND EQUITABLE RELIEF

1    Corinthian. An August 4, 2010 report discussed at the hearings revealed that, in an undercover

2    investigation of 15 for-profit colleges, *all 15 schools* engaged in "fraud, deceptive practices or made

3    misleading statements" to prospective students.[24] Corinthian was one of those schools.[25] At the

4    hearing, the Managing Director of the GAO's Office of Forensic Audits and Special Investigations

5    testified that the for-profit college industry is like "the wild west" where it "was difficult to sift

6    through fact from fiction."[26] The GAO's findings of misconduct are extensive, and very similar to

7    the conduct of Everest admissions representatives that is described in this Complaint. The GAO's

8    findings allege misconduct on the part of the 15 schools that include, but is not limited to deceptive

9    and questionable statements regarding the schools' accreditation, graduation rates, prospective

10   employment and salary qualifications, duration and cost of the program, and financial aid.[27] The

11   report also noted that representatives at schools "employ[ ] hard-sell sales and marketing techniques"

12   to encourage students to enroll.[28] Stockman remains unemployed and has over $13,000 in student

13   loan debt from his time at Everest.

14        71.    On the day before the HELP Committee hearing, Harris Miller, President and CEO of

15   the Career Colleges Association (of which Corinthian is a member) wrote a letter to member schools

16   stating that the "GAO report has to be a wakeup call to everyone in the sector that compliance in the

17   critical areas of admissions and financial aid" is "not what it needs to be," and observed that "for an

18   investigation to show so many problems in every school contacted is not good news."[29] He indicated

19   that both he and the schools should not "try to defend the indefensible, such as the findings of the

20   GAO report," and urged the schools to "wake-up."[30] Notably, Miller emphasized, perhaps too late, to

21

22

---

[24] Statements of Sen. Tom Harkin in *For Profit Schools: The Student Recruitment Experience before the S. Comm. on Health Education Labor & Pensions*, 11th Cong. (2010) (hereinafter "Second HELP Committee Hearing") (video and audio accessible at: http://help.senate.gov/hearings/hearing/?id+19454102-5056-9502-5d44-e2aa8233ba5a); see also Testimony of Gregory Kutz before the HELP Committee, *For-Profit Colleges: Undercover Testing Finds Colleges Encouraged Fraud and Engaged in Deceptive and Questionable Marketing Practices* (Aug. 4, 2010) (hereinafter "Undercover Report").

[25] *Id.*

[26] Statements of Gregory Kutz, Second HELP Committee Hearing.

[27] Undercover Report, p. 7-12.

[28] Undercover Report, p. 12.

[29] Letter dated Aug. 3, 2010, from Harris Miller to CCA members.

[30] *Id.*

COMPLAINT FOR CIVIL DAMAGES AND EQUITABLE RELIEF

1   overcome these egregious practices, "leadership on compliance must come from the top" and that "[a]

2   culture of compliance must permeate the organization."[31]

3       72.     Another Senate report found that, despite enrolling only 10% of post-secondary

4   education students, for-profit colleges obtain 25% of the $89 billion Federal Title IV loans distributed

5   annually to post-secondary institutions nationwide.[32]  For example, only 14% of community college

6   students take on student loan debt—compared to 97% of for-profit college students seeking similar

7   credentials.[33]

8       73.     It also found that for-profit colleges spend a disproportionate amount on television

9   advertisements, billboards, phone solicitations, web marketing, and hiring aggressive sales staff.[34]  It

10  pays off:  for-profit colleges enjoy profits that are among the highest in corporate America.  All of the

11  cash that is expended on advertisements and fuels for-profit share value is provided by tax payer

12  dollars.  In other words, the school gets paid, and only tax payers bear the risk that an unemployed

13  student graduating from the for-profit schools will default on their federal loans.

14      74.     Indeed, while currently enrolling only one in eight U.S. students, for-profit colleges

15  account for almost one in two federal-loan defaults.[35]  The Department of Education can attempt to

---

[31] *Id.*

[32] HELP Committee, *Emerging Risk? An Overview of Growth, Spending, Student Debt and Unanswered Questions in For-Profit Higher Education* at 3-4 (June 24, 2010).

[33] The Education Trust, "Subprime Opportunity:  The Unfulfilled Promise of For-Profit Colleges and Universities"  (November  2010)  (available  at http://www.edtrust.org/sites/edtrust.org/files/publications/files/Subprime_report_1.pdf).

[34] *Id.*

[35] Hechinger, John, "For Profit College Share Slump Converges With Surging Student Life-Debtors," Bloomberg (Dec. 28, 2010 (available at http://www.bloomberg.com/news/2010-12-28/for-profit-college-slump-converging-with-student-life-debtors.html).

COMPLAINT FOR CIVIL DAMAGES AND EQUITABLE RELIEF

1  retrieve these dollars by seizing student borrower paychecks, tax refunds, and Social Security

2  payments without a court order, and take as much as 15 percent of a borrower's disposable income.

3  Today, the Department of Education garnishes a reported 98,000 borrowers' wages.[36]

4  **V.    Litigation by the California Attorney General**

5     75.    In July of 2007, California Attorney General Edmund G. Brown, Jr. brought suit

6  against Corinthian Schools, Inc., alleging that it presented prospective students with inflated and

7  untrue employment and salary statistics, and used "various untrue and misleading statements to

8  induce students to enroll and not cancel Corinthian's programs, despite the poor chances of

9  success…" The Attorney General's complaint alleged violations of Cal. Bus. & Prof. Code Sections

10  17500 and 17200.

11     76.    In August of 2007, Corinthian paid $6.5 million to settle the action with the Attorney

12  General.  As part of that settlement, Corinthian was enjoined from enrolling new students in certain

13  programs for 18 months, and was further enjoined from, among other things, making untrue,

14  misleading, or deceptive statements to prospective students, failing to provide disclosures to

15  prospective students as required by California law, and engaging in unlawful, unfair, or fraudulent

16  acts or practices relating to the recruitment of students, the offer or sale of any program of instruction,

17  the transferability of credits, and the employment of students.

18  **VI.    Litigation By The Florida Attorney General**

19     77.    The Florida Attorney General's Office also investigated the "advertising and

20  marketing practices" of Florida Metropolitan University, which Defendants also owned (the school

21  has since become part of the Everest College brand).  Students complained that the school

22  misrepresented the transfer value of credits and did not clearly disclose that the credits might not be

23  accepted at other schools.  After the Florida Attorney General review of Florida Metropolitan

24  University's internal training documents, job-placement rates, and advertising and marketing

25  practices, Defendants agreed to pay $99,900 in investigation fees and take various preventative steps,

26  including the creation of a "transfer center."

27

28
_____

[36] *Id.*

COMPLAINT FOR CIVIL DAMAGES AND EQUITABLE RELIEF

78.     On October 18, 2010, the Florida Attorney General initiated a second investigation of Everest College campuses to determine whether it violated Florida unfair business practices law by using deceptive recruiting practices and misrepresentations regarding Everest accreditation and campus financial aid.

## CLASS ALLEGATIONS

79.     This action is brought and may properly be maintained as a class action pursuant to the provisions of Fed. R. Civ. P. 23 (b)(2) and/or (3).  Plaintiff brings this action, on behalf of himself and others similarly situated, as a representative member of the following proposed class (the "Class"):

> All persons who completed courses and/or received credits from Everest, at
> any campus located in the United States, during the period commencing four
> years prior to the date of the filing of this action.

**I.     The Parties Are Numerous**

80.     The proposed Class is so numerous that it is impracticable to bring them all before the court.  Though the exact number and identities of Class members are unknown at this time, and can be ascertained only through appropriate discovery, the Class is believed to contain thousands of persons.  The number and identity of other Class members may be determined from the records of Defendants, and potential Class members may easily and quickly be notified of the pendency of this action.

**II.     Common Questions of Law and Fact Predominate (Fed. Civ. R. P. 23(a)(2) and 23(b)(3))**

81.     This case presents questions of law and fact common to the Class, including, but not limited to, the following:

a.     Whether Defendants engaged in deceptive, misleading, unfair, fraudulent, or otherwise unlawful practices through their non-disclosure of material facts related to Everest's accreditation and the transferability of credits;

b.     Whether Defendants engaged in unfair and unlawful practices by devising, implementing, authorizing or sanctioning the internal policies or training programs described herein;

COMPLAINT FOR CIVIL DAMAGES AND EQUITABLE RELIEF

c.      Whether Defendants engaged in deceptive, misleading, unfair, fraudulent, or otherwise unlawful practices through policies that caused their admissions representatives to make misrepresentations and omissions regarding the placement rates and employability of Everest graduates;

d.      Whether Defendants' conduct constituted fraud, constructive fraud, or negligent misrepresentation, as alleged herein;

e.      Whether Defendants breached their Enrollment Agreement by failing to provide career services;

f.      Whether the arbitration clause in Defendants' Enrollment Agreement is unconscionable because it was procured by way of the fraudulent and unconscionable conduct described herein and is otherwise substantively unconscionable;

g.      Whether Plaintiff and members of the Class are entitled to recover actual damages, as a result of Defendants' unlawful practices;

h.      Whether Plaintiff and members of the Class are entitled to recover restitution of the tuition paid to Defendants as a result of their unlawful practices;

i.      Whether Plaintiff and members of the Class are entitled to ancillary relief including a disgorgement of the profits enjoyed as a result of Defendants' unlawful practices;

j.      Whether Plaintiff and members of the Class are entitled to recover punitive damages as a result of Defendants' unlawful practices;

k.      Whether Plaintiff and members of the Class are entitled to an award of reasonable attorneys' fees, pre-judgment interest and costs of this suit; and

82.     Whether Defendants should be enjoined from making false and misleading representations to students prior to enrollment and ordered to properly disclose its lack of regional accreditation and the consequences thereof.

83.     These many questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.

COMPLAINT FOR CIVIL DAMAGES AND EQUITABLE RELIEF

1   **III.     Plaintiff's Claims are Typical of the Class (Fed. Civ. R. 23(a)(3)**

2          84.     Plaintiff's claims are typical of the claims of the members of the Class because they

3   have all been damaged in the same way as a result of Defendants' failure to disclose material facts

4   and policies of misrepresentation and omissions.  Accordingly, the interests of the representative

5   Plaintiff are co-extensive with the interests of each Class member and all have a common right of

6   recovery based upon the same facts.

7   **IV.     Defendants Have Acted or Failed to Act on Grounds Generally Applicable to the Class**

8          **(Fed. Civ. R. 23(b)(2))**

9          85.     Defendants have made misrepresentations and omissions to the Class and/or failed to

10  state material facts on grounds generally applicable to the Class, entitling the Class to injunctive relief

11  and restitution.

12  **V.     The Class Representative Can Fairly and Adequately Represent the Class (Fed. Civ. R.**

13         **23(a)(4))**

14         86.     Plaintiff is an adequate representative of the Class because Plaintiff are members of

15  the Class and their interests do not conflict with the interests of the Class.  The interests of the Class

16  will be fairly and adequately protected by Plaintiff and their undersigned counsel, who are competent

17  and experienced in the prosecution of class action litigation.

18  **VI.     A Class Action Is Superior to Other Forms of Litigation (Fed Civ. R. 23(b)(3)**

19         87.     Class litigation would provide for the most fair and efficient adjudication of the Class'

20  claims.  Should individual Class members be required to bring separate actions, multiple federal

21  courts would be confronted by a multiplicity of lawsuits, thus burdening the court system while also

22  creating the risk of inconsistent rulings and contradictory judgments.  In contrast to proceeding on a

23  case-by-case basis, in which inconsistent results would magnify the delay and expense to all parties

24  and the court system, this class action will present far fewer management difficulties while providing

25  unitary adjudication, economies of scale and comprehensive supervision by a single court.

26  **VII.     Class Notice (L.R 23,2(g))**

27         88.     The class representative contemplates the eventual issuance of notice to proposed

28  Class members setting forth the nature and subject of the instant action.  Upon information and belief,

-21-

COMPLAINT FOR CIVIL DAMAGES AND EQUITABLE RELIEF

1    Defendants' own business records and electronic media can be utilized to locate members and
2    provide the contemplated notices.  To the extent any further notices may be required, the class
3    representative will use additional media and/or mailings to provide such notice.

4           WHEREFORE, Plaintiff, on behalf of themselves and the Class, pray for an order certifying
5    the Class and appointing Plaintiff and their counsel of record to represent the Class.

6                                          **COUNT I**

7                   **VIOLATION OF THE CONSUMER LEGAL REMEDIES ACT**

8           89.    Plaintiff incorporates by reference each and every allegation set forth above as if fully
9    stated herein, except that Plaintiff specifically excludes allegations seeking or claiming damages as to
10   this cause of action at this time.

11          90.    Concurrently with the filing of this Complaint, Plaintiff has sent notice to Defendants
12   regarding their violation of the Consumer Legal Remedies Act ("CLRA"), in accordance with the
13   requirements of Cal. Civ. Code § 1782.

14          91.    If Defendants do not correct, repair, replace, or otherwise rectify the goods or services
15   alleged to be in violation of Section 1770 within the time proscribed by the statute, Plaintiff will
16   amend this complaint to add a cause of action for damages under the CLRA.

17          92.    Defendants are "persons" under § 1761 of the CLRA because they are corporations.

18          93.    Plaintiff is a "consumer" within the meaning of § 1761 of the CLRA because he is an
19   individual who acquired services from Corinthian for personal purposes.

20          94.    The conduct complained of herein involves a "transaction" within the meaning of the
21   CLRA, and encompasses the making and performance of the Enrollment Agreement entered into
22   between Plaintiff and Defendants, whether or not that Agreement is enforceable.

23          95.    Section 1770 of the CRLA proscribes "unfair methods of competition and unfair or
24   deceptive acts or practices" that are "intended to result in the sale or lease of goods and services to
25   consumers," including:

26          a.     Misrepresenting the source, sponsorship, approval, or certification of goods or
27   services;

28

                                          -22-
                 COMPLAINT FOR CIVIL DAMAGES AND EQUITABLE RELIEF

1      b.      Representing that goods or services have sponsorship, approval, characteristics,

2 ingredients, uses, benefits, or quantities which they do not have;

3      c.      Representing that goods or services are of a particular standard, quality, or grade, if

4 they are of another;

5      d.      Advertising goods or services with the intent not to sell them as advertised.

6      96.      Defendants engaged in multiple unlawful acts under the CLRA by engaging in the

7 following acts intended to induce students into enrolling at Everest, by, without limitation:

8      a.      Stating false placement rates during the recruiting process;

9      b.      Falsely stating during the recruiting process that almost all students were placed after

10 graduation;

11      c.      Making material misrepresentations and  false statements during the recruiting process

12 about the potential salary of a graduating student;

13      d.      Falsely advertising that it provides job placement assistance to students after

14 graduation on their website and during the recruiting process;

15      e.      Making deceptive and misleading statements and representations on their website and

16 during the recruiting process about Everest's reputation with employers;

17      f.      Making deceptive and misleading statements and representations on their website and

18 during the recruiting process about the value of a degree earned at Everest;

19      g.      Making deceptive and misleading statements and representations on their website and

20 during the recruiting process about the pace at which an Everest graduate finds a job in her chosen

21 career after graduation;

22      h.      Making deceptive and misleading statements and representations on their website and

23 during the recruiting process about the quantity of Everest students that finds a job in their chosen

24 career after graduation;

25      i.      Making material omissions and misrepresentations, and false statements on their

26 website and during the recruiting process regarding the transferability of credits earned at Everest to

27 other post-secondary community colleges and universities;

28

-23-
COMPLAINT FOR CIVIL DAMAGES AND EQUITABLE RELIEF

j.      Making material omissions, misrepresentations, and false statements on their website and during the recruiting process regarding Everest's accreditation;

k.      Failing to explain the effect of the terms of the Enrollment Agreement specific to the 'probability' of the transferability of Everest College credit during the recruiting process.

97.     The omissions, misrepresentations, and false and misleading statements described in the preceding paragraph regarding placement, employability, and transferability were material to Plaintiff's decision to enroll at Everest, and Plaintiff justifiably relied upon the statements of Everest representatives.  Plaintiff and members of the Class enrolled at Everest for the purpose of securing a job, and to earn credits that could transfer to other schools to obtain additional degrees.

98.     Everest knew the intentions of Plaintiff and members of the Class, and implemented strategic, manipulative, and oppressive tactics to gain prospective students' trust and to intentionally suppress material information about Everest's services, degrees, and the outcomes of its graduates.

99.     Plaintiff and members of the Class justifiably relied on the representations and suffered harm as a proximate result of Defendants' conduct.

100.    Under the CLRA, Plaintiff and members of the Class would be entitled to:

a.      Actual damages, including minimum statutory damages of $1,000  per injured person;

b.      An order enjoining the unlawful practices described herein;

c.      Restitution;

d.      Appropriate ancillary relief including disgorgement of profits;

e.      Punitive damages;

f.      Reasonable attorneys' fees and costs; and

g.      Any other relief that the Court deems proper.

## COUNT II

## FALSE ADVERTISING

101.    Plaintiff incorporates by reference each and every allegation, except paragraph 89, set forth above as if fully stated herein.

102.    Section 17500 of the California Business and Professions Code ("FAL") provides that it is unlawful to falsely publicize a "circumstance or matter of fact connected with the proposed

COMPLAINT FOR CIVIL DAMAGES AND EQUITABLE RELIEF

1  performance or disposition" of a good or service when that party knew or should have known the

2  advertisement was, in fact, false or misleading, with the intention of inducing the purchase of the

3  goods or services.

4       103.    Defendants violated Section 17500 of the FAL pursuant to a comprehensive policy

5  and practice by Defendants which includes, without limitation:

6       a.    Stating false placement rates during the recruiting process;

7       b.    Falsely stating during the recruiting process that almost all of the students were placed

8  after graduation;

9       c.    Advertising that it provides job placement assistance to students after graduation on

10  their website and during the recruiting process;

11       d.    Stating on their website that "Everest grads have a bright career outlook;"

12       e.    Stating on their website that "Employers hire Everest graduates because they

13  recognize the quality of the training [Everest] provide[s]. They understand that [Everest] graduates

14  have the kind of career training it takes to succeed in their chosen profession."

15       f.    Stating on their website that "The majority of our graduates begin their careers within

16  a few months of graduating—because we train them with skills that are current and desired by

17  employers."

18       g.    Making false and misleading statements during the recruiting process to either state or

19  imply that credits earned at Everest were transferable to other post-secondary community colleges

20  and universities;

21       h.    Omitting during the recruiting process and on their website that Everest was nationally

22  accredited and not regionally accredited, and that credits earned at the school were not likely

23  transferable to other post-secondary community colleges and universities.

24       104.    The statements were false advertisements because they were statements of fact or

25  descriptions of the value of an Everest education that Everest did not actually intend to provide, and

26  were made an effort to sell Everest's programs to prospective students.

27       105.    Defendants knew that the statements at 49(a), (b), (c), (e), and (f) above regarding

28  placement rates and the employability of its graduates were false at the time they were made. Everest

COMPLAINT FOR CIVIL DAMAGES AND EQUITABLE RELIEF

1   previously enrolled and graduated thousands of students at the Reseda campus, and hundreds of

2   thousands of students nationwide.  Defendants knew the actual rate of placement after graduation,

3   knew about the lukewarm or cold reception of its graduates by the overwhelming majority of

4   employers in California and across the nation, due to certain measurable aspects of its programs and

5   its training, and an industry reputation for providing poor and/or inadequate job skills to its students.

6   Additionally, Everest knew that few students graduating in a given program at its Reseda campus was

7   not employed after graduation, and knew or should have known that its Career Services Center did

8   not provide the job placement services described on its website and during the recruiting process.

9   106.   Defendants knew that statements 49(a), (b), (c), (d), (e), and (f) above regarding

10   placement rates and the employability of its graduates were misleading at the time they were made.

11   Many of the students who enrolled at Everest were unemployed or not earning a living wage.

12   Accordingly, Everest knew that, at a minimum, if not otherwise patently false, these statements are

13   unreasonably optimistic and suggestive, and were likely to mislead students into believing that

14   attendance at Everest will result in a well-paying job.

15   107.   Defendants knew that statement 49(g) above regarding the transferability of their

16   credits was false.  Defendants knew that all but two of its 101 campuses across the United States were

17   nationally accredited, and not regionally accredited and that credits earned there were not and are not

18   likely to be accepted by a regionally accredited school in any region of the United States.

19   108.   Defendants knew that omission 49(h) above had a tendency to mislead and deceive

20   Plaintiff and the Class.  Defendants publicly and repeatedly professed an awareness that most of its

21   students were from "low-income" and largely previously uneducated groups that were not likely to

22   know the difference between national and regional accreditation, but did not disclose the typical

23   affect of its accreditation on their website, or during the recruiting process.

24   109.   Plaintiff and members of the Class enrolled at Everest for the purpose of securing a job

25   and to earn credits that could transfer to other schools to obtain additional degrees.  The acts were

26   thus material to Plaintiff' decision to enroll at Everest, and Plaintiff justifiably relied upon the

27   statements of Everest representatives.

28

110.   Plaintiff and members of the Class suffered harm as a proximate result of Defendants' violations of the False Advertising Law.

WHEREFORE, Plaintiff on behalf of himself and on behalf of the members of the Class pray for:

a.   An order enjoining the unlawful practices described herein;

b.   Restitutionary relief, including disgorgement of profits;

c.   Any other relief that the Court deems proper.

## COUNT III

## UNFAIR COMPETITION LAW

### (Unfair Business Practices)

111.   Plaintiff incorporates by reference each and every allegation set forth above, except paragraph 89, as if fully stated herein.

112.   Section 17200 of the California Business and Professions Code ("UCL") provides that it is unfair competition to engage in any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising," and to engage certain acts that are prohibited in the Business and Professions Code.   Defendants violated Section 17200 of the UCL pursuant to a comprehensive policy and practice by Defendants which included, without limitation:

a.   Stating false placement rates during the recruiting process;

b.   Falsely stating during the recruiting process that almost all of the students were placed after graduation;

c.   Making material misrepresentations and  false statements during the recruiting process about the potential salary of a graduating student;

d.   Falsely advertising that Defendants provide job placement assistance to students after graduation on their website and during the recruiting process;

e.   Making deceptive and misleading statements and representations on their website and during the recruiting process about Everest's reputation with employers;

f.   Making deceptive and misleading statements and representations on their website and during the recruiting process about the value of a degree earned at Everest;

COMPLAINT FOR CIVIL DAMAGES AND EQUITABLE RELIEF

g. Making deceptive and misleading statements and representations on their website and during the recruiting process about the pace at which an Everest graduate finds a job in her chosen career after graduation;

h. Making deceptive and misleading statements and representations on their website and during the recruiting process about the quantity of Everest students that finds a job in their chosen career after graduation;

i. Making material omissions and misrepresentations, and false statements on its website and during the recruiting process regarding the transferability of credits earned at Everest to other post-secondary community colleges and universities;

j. Making material omissions, misrepresentations, and false statements on their website and during the recruiting process regarding Everest's accreditation;

k. Failing to explain the effect of the terms of the Enrollment Agreement specific to the 'probability' of the transferability of Everest College credit during the recruiting process.

113. The described acts were unfair business practices because they were unethical, unscrupulous, oppressive, and substantially injurious to consumers such as Plaintiff and members of the Class.

114. Plaintiff and members of the Class enrolled at Everest for the purpose of securing a job and to earn credits that could transfer to other schools to obtain additional degrees. The acts were thus material to Plaintiff' decision to enroll at Everest, and Plaintiff justifiably relied upon the statements of Everest representatives.

115. Plaintiff and members of the Class suffered harm as a proximate result of Defendants' violations of the UCL.

WHEREFORE, Plaintiff on behalf of themselves and on behalf of the members of the Class pray for:

a. An order enjoining the unfair practices described herein;

b. Restitutionary relief, including disgorgement of profits;

c. Any other relief that the Court deems proper.

COMPLAINT FOR CIVIL DAMAGES AND EQUITABLE RELIEF

## COUNT IV

## UNFAIR COMPETITION LAW

### (Unlawful Business Practices)

116.    Plaintiff incorporates by reference each and every allegation set forth above, except paragraph 89, as if fully stated herein.

117.    Section 17200 of the UCL provides that it is unfair competition to engage in any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising," and to engage certain acts that are prohibited in the Business and Professions Code. Defendants violated Section 17200 of the UCL pursuant to a comprehensive policy and practice by Defendants which included, without limitation:

a.    Stating false placement rates during the recruiting process;

b.    Falsely stating during the recruiting process that almost all of the students were placed after graduation;

c.    Making material misrepresentations and  false statements during the recruiting process about the potential salary of a graduating student;

d.    Falsely advertising that it provides job placement assistance to students after graduation on its website and during the recruiting process;

e.    Making deceptive and misleading statements and representations on their website and during the recruiting process about Everest's reputation with employers;

f.    Making deceptive and misleading statements and representations on their website and during the recruiting process about the value of a degree earned at Everest;

g.    Making deceptive and misleading statements and representations on their website and during the recruiting process about the pace at which an Everest graduate finds a job in her chosen career after graduation;

h.    Making deceptive and misleading statements and representations on their website and during the recruiting process about the quantity of Everest students that finds a job in their chosen career after graduation;

COMPLAINT FOR CIVIL DAMAGES AND EQUITABLE RELIEF

i.      Making material omissions and misrepresentations, and false statements on their website and during the recruiting process regarding the transferability of credits earned at Everest to other post-secondary community colleges and universities;

j.      Making material omissions, misrepresentations, and false statements on its website and during the recruiting process regarding Everest's accreditation;

k.      Failing to explain the effect of the terms of the Enrollment Agreement specific to the 'probability' of the transferability of Everest College credit during the recruiting process.

118.    The described acts are unlawful because they are violations of California law, and similar laws of other jurisdictions, including the CRLA, Cal. Civ. Code § 1780 et seq., and the False Advertising Law, Cal. Civ. Code § 17500 et seq.

119.    Plaintiff and members of the Class enrolled at Everest for the purpose of securing a job and to earn credits that could transfer to other schools to obtain additional degrees.  The acts were thus material to Plaintiff' decision to enroll at Everest, and Plaintiff justifiably relied upon the statements of Everest representatives.

120.    Plaintiff and members of the Class suffered harm as a proximate result of Defendants' violations of the UCL.

WHEREFORE, Plaintiff on behalf of himself and on behalf of the members of the Class pray for:

a.      An order enjoining the unlawful practices described herein;

b.      Restitutionary relief, including disgorgement of profits;

c.      Any other relief that the Court deems proper.

## COUNT V

## UNFAIR COMPETITION LAW

### (Fraudulent Business Practices)

121.    Plaintiff incorporates by reference each and every allegation set forth above, except paragraph 89, as if fully stated herein.

122.    Section 17200 of the UCL provides that it is unfair competition to engage in any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading

1   advertising," and to engage certain acts that are prohibited in the Business and Professions Code.

2   Defendants violated Section 17200 of the UCL pursuant to a comprehensive policy and practice by

3   Defendants which included, without limitation:

4         a.      Stating false placement rates during the recruiting process;

5         b.      Falsely stating during the recruiting process that almost all of the students were placed

6   after graduation;

7         c.      Making material misrepresentations and  false statements during the recruiting process

8   about the potential salary of a graduating student;

9         d.      Falsely advertising that it provides job placement assistance to students after

10   graduation on its website and during the recruiting process;

11         e.      Making deceptive and misleading statements and representations on their website and

12   during the recruiting process about Everest's reputation with employers;

13         f.      Making deceptive and misleading statements and representations on their website and

14   during the recruiting process about the value of a degree earned at Everest;

15         g.      Making deceptive and misleading statements and representations on their website and

16   during the recruiting process about the pace at which an Everest graduate finds a job in her chosen

17   career after graduation;

18         h.      Making deceptive and misleading statements and representations on their website and

19   during the recruiting process about the quantity of Everest students that finds a job in their chosen

20   career after graduation;

21         i.      Making material omissions and misrepresentations, and false statements on their

22   website and during the recruiting process regarding the transferability of credits earned at Everest to

23   other post-secondary community colleges and universities;

24         j.      Making material omissions, misrepresentations, and false statements on their website

25   and during the recruiting process regarding Everest's accreditation;

26         k.      Failing to explain the effect of the terms of the Enrollment Agreement specific to the

27   'probability' of the transferability of Everest College credit during the recruiting process.

28

COMPLAINT FOR CIVIL DAMAGES AND EQUITABLE RELIEF

1    123.    The described acts are fraudulent business practices because Everest's representations

2  of placement, employability, and transferability were false and were likely to deceive the public.

3  Defendants previously enrolled and graduated hundreds of students at the Reseda campus, and

4  thousands of students nationwide.  Defendants knew the actual rate of placement after graduation,

5  knew about the lukewarm or cold reception of its graduates by the overwhelming majority of

6  employers in California and across the nation, due to certain measurable aspects of its programs and

7  its training and an industry reputation for providing poor and/or inadequate job skills to its students.

8  Defendants knew that the majority of Medical Billing and Coding students at its Reseda campus are

9  not employed after graduation, and knew or should have known that its Career Services Center did

10  not provide the job placement services described on its website and during the recruiting process.

11  Additionally, Defendants knew that all but two of its 101 campuses across the United States are

12  nationally accredited—and that with few exceptions, credits earned there have not been, and are not

13  likely to be accepted by a  regionally accredited school in any region of the United States.

14    124.    The fraudulent business practices were executed with the intent to deceive Plaintiff

15  and members of the Class into enrolling at Everest.  Everest devised a scheme to deceive Plaintiff and

16  members of the Class, which includes, but is not limited to, training its admissions representatives to

17  manipulate students during the high-pressured sales calls and meetings, knowingly condoning or

18  instructing admissions representatives to disseminate false or misleading information and omit

19  material information during communications with students, and failing to train admissions

20  representatives in areas that were known to be material to a student's decision to attend Everest.

21    125.    Plaintiff and members of the Class enrolled at Everest for the purpose of securing a job

22  and to earn credits that could transfer to other schools to obtain additional degrees.  The acts were

23  thus material to Plaintiff' decision to enroll at Everest, and Plaintiff justifiably relied upon the

24  statements of Everest representatives.

25    126.    Plaintiff and members of the Class have suffered harm as a proximate result of

26  Defendants' violations of the UCL, in that they paid substantial sums for credits that are not

27  transferable to other schools and are not likely to result in employment after graduation.

28

COMPLAINT FOR CIVIL DAMAGES AND EQUITABLE RELIEF

1   WHEREFORE, Plaintiff on behalf of himself and on behalf of the members of the Class pray

2   for:

3       a.    An order enjoining the unlawful practices described herein;

4       b.    Restitutionary relief, including disgorgement of profits;

5       c.    Any other relief that the Court deems proper.

6   **COUNT VI**

7   **FRAUDULENT MISREPRESENTATION**

8       127.    Plaintiff and members of the Class are entitled to a measure of damages for common

9   law fraud under the California Civil Code and the similar laws of other jurisdictions, for the fraud

10   described with specificity in the paragraphs above.

11       128.    The fraudulent misrepresentations were made to Plaintiff and all members of the

12   Class, pursuant to a comprehensive policy and practice by Defendants which includes, but is not

13   limited to:

14       a.    Stating false placement rates during the recruiting process;

15       b.    Falsely stating during the recruiting process that almost all of the students were placed

16   after graduation;

17       c.    Making material misrepresentations and  false statements during the recruiting process

18   about the potential salary of a graduating student;

19       d.    Falsely advertising that it provides job placement assistance to students after

20   graduation on their website and during the recruiting process;

21       e.    Making false statements on their website and during the recruiting process about

22   Everest's reputation with employers;

23       f.    Making false statements on their website and during the recruiting process about the

24   value of a degree earned at Everest;

25       g.    Making false statements on their website and during the recruiting process about the

26   pace at which an Everest graduate finds a job in her chosen career after graduation;

27       h.    Making false statements on their website and during the recruiting process about the

28   quantity of Everest students that find a job in their chosen career after graduation;

-33-

i.      Making false statements on their website and during the recruiting process regarding the transferability of credits earned at Everest to other post-secondary community colleges and universities;

j.      Making false statements during the recruiting process regarding Everest's accreditation.

129.    As described with specificity above, Everest knew the falsity of its representations, and they were made with the intent to deceive Plaintiff and members of the Class into enrolling at Everest.  The acts were material to Plaintiff' decision to enroll at Everest, and Plaintiff justifiably relied upon the statements of Everest representatives.

130.    Plaintiff and members of the Class suffered harm as a proximate result of Defendants' fraudulent acts.

WHEREFORE, Plaintiff and members of the Class are entitled to:

a.      General damages;

b.      Special damages in an amount according to proof;

c.      An order enjoining the unlawful practices described herein;

d.      Punitive damages;

e.      Reasonable attorneys' fees and costs; and

f.      Any other relief that the Court deems proper, or available for common law fraud in other jurisdictions.

## COUNT VII

## NEGLIGENT MISREPRESENTATION

131.    Plaintiff and members of the Class are entitled to a measure of damages for common law negligent misrepresentation under California law because Everest knew or should have known that its representations of placement, employability, and transferability were false.  Everest previously enrolled and graduated hundreds of students and knew the actual rate of placement after graduation, knew or should have known about its own lukewarm or negative reputation with many employers, and knew or should have known that its credits had not previously been and were not likely to be accepted at few, if any, regionally accredited schools in any region of the United States.

-34-

COMPLAINT FOR CIVIL DAMAGES AND EQUITABLE RELIEF

132.    The fraudulent misrepresentations were made to Plaintiff and all members of the Class, pursuant to a comprehensive policy and practice by Defendants which includes, but is not limited to:

a.    Stating false placement rates during the recruiting process;

b.    False statements and misrepresentations during the recruiting process that almost all of the students were placed after graduation;

c.    Making false statements and misrepresentations during the recruiting process about the potential salary of a graduating student;

d.    Advertisements that it provides job placement assistance to students after graduation on its website and during the recruiting process;

e.    Making false, deceptive and misleading statements and representations on their website and during the recruiting process about Everest's reputation with employers;

f.    Making false, deceptive and misleading statements and representations on their website and during the recruiting process about the value of a degree earned at Everest;

g.    Making false, deceptive and misleading statements and representations on its website and during the recruiting process about the pace at which an Everest graduate finds a job in her chosen career after graduation;

h.    Making false, deceptive and misleading statements and representations on their website and during the recruiting process about the quantity of Everest students that finds a job in their chosen career after graduation;

i.    Making material omissions and misrepresentations, and false statements on their website and during the recruiting process regarding the transferability of credits earned at Everest to other post-secondary community colleges and universities;

j.    Making material omissions, misrepresentations, and false statements on its website and during the recruiting process regarding Everest's accreditation;

k.    Failing to explain the effect of the terms of the Enrollment Agreement specific to the 'probability' of the transferability of Everest College credit during the recruiting process.

COMPLAINT FOR CIVIL DAMAGES AND EQUITABLE RELIEF

1    133.    As described with specificity above, Everest knew or should have known these
2  representations were misleading or false.  The acts were material to Plaintiff' decision to enroll at
3  Everest, and Plaintiff justifiably relied upon the statements of Everest representatives.

4    134.    Plaintiff and members of the Class have suffered harm as a proximate result of
5  Defendants' negligent misrepresentations.

6    WHEREFORE Plaintiff and members of the Class are entitled to:

7    a.    General damages;

8    b.    Special damages in an amount according to proof;

9    c.    An order enjoining the unlawful practices described herein;

10   d.    Punitive damages;

11   e.    Reasonable attorneys' fees and costs; and

12   f.    Any other relief that the Court deems proper.

13   **COUNT VIII**

14   **CONSTRUCTIVE FRAUD**

15   135.    Plaintiff incorporates by reference each and every allegation set forth above, except
16  paragraph 89, as if fully stated herein.

17   136.    According to Cal. Civ. Code § 1573, constructive fraud is "any breach of duty which,
18  without an actually fraudulent intent, gains an advantage to the person in fault, or any one claiming
19  under him, by misleading another to his prejudice, or to the prejudice of any one claiming under
20  him."

21   137.    Defendants trained their admissions representatives to establish a personal relationship
22  with prospective students in order to better sell them on enrollment.  Admissions representatives
23  knowingly established and accepted this position of trust and confidence.  Admissions representatives
24  used the relationship to influence the prospective student's decision to spend thousands of dollars to
25  enroll at Everest.  The prospective student justifiably relied upon the admissions representative
26  because the admissions representative represented to the student that he or she was acting in the
27  student's best interest and for the student's benefit.  Despite this fiduciary relationship, Everest
28  admissions representatives used it to convince the students to attend Everest for the benefit of

-36-
COMPLAINT FOR CIVIL DAMAGES AND EQUITABLE RELIEF

1    Defendants, even when it was not in the student's best interest, or it was to the prospective student's

2    disadvantage.  As a result, Defendants substantially benefitted from student enrollment, at the

3    student's expense.

4          138.    Defendants breached this duty by failing to disclose material facts and/or making

5    material omissions, misrepresentations, and false promises regarding its rate of placement, the

6    employability of its graduates, and transferability of its credits and the terms of enrollment, that it

7    knew or should have known were false and misleading.  Defendants knew about their negative

8    reputation with many employers, that they did not place students at a rate of almost 90%, and that

9    their credits had not previously been and were not likely to be accepted at few, if any, regionally

10   accredited schools in any region of the United States.  Defendants also knew of the advantageous

11   disclosures in its Enrollment Agreement regarding the probability of credit transfer and resolution of

12   disputes between the student and Everest.

13         139.    As fiduciaries, Everest representatives were required to fully disclose the true nature of

14   employer relationships and the value of their degrees at other institutions.  As fiduciaries, Everest

15   representatives were also required to fully disclose, in a manner that the student understood, the

16   material terms of their Enrollment Agreement.

17         140.    The breaches of duty include, but are not limited to:

18         a.      Stating false placement rates during the recruiting process;

19         b.      False statements and misrepresentations during the recruiting process that almost all of

20   the students were placed after graduation;

21         c.      Making false statements and misrepresentations during the recruiting process about the

22   potential salary of a graduating student;

23         d.      Advertisements that it provides job placement assistance to students after graduation

24   on their website and during the recruiting process;

25         e.      Making false, deceptive and misleading statements and representations on their

26   website and during the recruiting process about Everest's reputation with employers;

27         f.      Making deceptive and misleading statements and representations during the recruiting

28   process about Everest's placement resources;

-37-

COMPLAINT FOR CIVIL DAMAGES AND EQUITABLE RELIEF

g.    Making false, deceptive and misleading statements and representations on their website and during the recruiting process about the value of a degree earned at Everest;

h.    Making false, deceptive and misleading statements and representations on their website and during the recruiting process about the pace at which an Everest graduate finds a job in her chosen career after graduation;

i.    Making false, deceptive and misleading statements and representations on their website and during the recruiting process about the quantity of Everest students that find a job in their chosen career after graduation;

j.    Making material omissions and misrepresentations, and false statements on their website and during the recruiting process regarding the transferability of credits earned at Everest to other post-secondary community colleges and universities;

k.    Making material omissions, misrepresentations, and false statements on their website and during the recruiting process regarding Everest's accreditation;

l.    Failing to explain the effect of the terms of the Enrollment Agreement specific to the 'probability' of the transferability of Everest College credit during the recruiting process;

m.    Failing to review the disclosures with prospective students upon Enrollment, including disclosure regarding class waiver and the submission of controversies to arbitration.

141.    Everest admissions representatives used the trusting relationship and these enumerated acts of breach to convince the students to enter into Enrollment Agreements and attend Everest. As a result, the students justifiably relied upon the admissions representatives' representations, disclosures and misrepresentations and disclosures, and enrolled in an Everest program to their detriment, to Everest's advantage.

142.    Plaintiff and members of the Class suffered harm as a proximate result of Defendant's breaches and acts of constructive fraud.

WHEREFORE Plaintiff and members of the Class are entitled to:

a.    General damages;

b.    Special damages in an amount according to proof;

COMPLAINT FOR CIVIL DAMAGES AND EQUITABLE RELIEF

1   c.  A declaration that the Enrollment Agreements were procured by way of constructive

2 fraud and are null void;

3   d.  Reasonable attorneys' fees and costs; and

4   e.  Any other relief that the Court deems proper.

5           **COUNT IX**

6   **UNLAWFUL AND UNCONSCIONABLE ARBITRATION CLAUSE**

7   143.  Plaintiff incorporates by reference each and every allegation set forth above, except

8 paragraph 89, as if fully stated herein.

9   144.  Section § 1607.5 of the California Civil Code declares unconscionable contract

10 provisions unenforceable.

11   145.  Everest's Enrollment Agreement contains an arbitration provision to submit "any

12 dispute" to arbitration and prohibit students from consolidating claims with other students in a class

13 or mass actions against Defendants.

14   146.  The clause limits Plaintiff' rights to class litigation and, thus, prevents Class members

15 from obtaining the equitable declaratory and injunctive relief afforded for deceptive, unconscionable,

16 and misleading conduct.

17   147.  Additionally, the clause wrongfully limits Plaintiff' right to recover in consolidated

18 litigation against Everest where individual litigation would be impracticable, overly burdensome, and

19 judicially inefficient.  The clause thus has a chilling effect on consumer litigation against Everest that

20 effectively insulates Everest from liability.

21   148.  The clause is unfairly oppressive to students and exculpates Everest from liability

22 because Everest never uses arbitration to enforce its Enrollment Agreements or recover unpaid

23 tuition.  Rather, the overwhelming majority of Everest's tuition is paid through federal Title IV

24 student lending programs.  Moreover, the remaining ten percent of Everest's tuition is paid by its own

25 in-house lending program.  When a student defaults on a loan with Everest, uses outside collection

26 agencies, or sells the loans to other companies.  Thus, the clause is only enforceable as to the students

27 alone, and is substantively unconscionable.

28

COMPLAINT FOR CIVIL DAMAGES AND EQUITABLE RELIEF

149.    The clause is contained in an agreement that is entered into after high-pressure sales meetings wherein there is highly unequal bargaining power between Everest and the prospective student.  During these meetings, students are discouraged from reading the full Agreement, and encouraged to sign it quickly, without a full understanding of its terms. Representatives are instructed to move as quickly as they can through the signing process so as to not raise any new concerns about enrolling at Everest.   Representatives are discouraged from allowing students to leave with the Enrollment Agreement if they did not enroll.    Students are not provided a copy of the Enrollment Agreement after enrollment, or in enough time to exercise the cancellation provisions of the Agreement.

150.    Additionally, the Agreement was entered into during a high-pressure sales meeting where multiple fraudulent misrepresentations and omissions occurred and a general lack of mutuality permeated the negotiations.

151.    The multiple substantively unconscionable defects of the clause are alone indicative of an unlawful effort to impose arbitration on students not as an alternative to litigation, but in an inferior forum that works to Everest's advantage.  Moreover, the circumstances under which the clause was presented were egregiously unfair and oppressive, devoid of any actual negotiation, and designed to take advantage of the unequal bargaining power between the student and Everest.  These unconscionable aspects, either combined or alone, render the clause wholly unenforceable.

152.    Plaintiff and members of the Class are entitled to declaratory relief that the multiple substantive and procedural defects of the arbitration clause render it wholly unconscionable and unenforceable.

WHEREFORE, Plaintiff, on behalf of himself and the Class, prays for:

a.    A declaration that the arbitration clause in Everest's Enrollment Agreement is unconscionable and unenforceable.

b.    Actual damages, including minimum statutory damages of $1,000 per injured person;

c.    An order enjoining the unlawful practices described herein;

d.    Restitution;

e.    Appropriate ancillary relief including disgorgement of profits;

COMPLAINT FOR CIVIL DAMAGES AND EQUITABLE RELIEF

1       f.      Imposition of a constructive trust upon all monies and assets Defendants acquired as a

2  result of its unfair and unlawful practices;

3       g.      Punitive damages;

4       h.      Reasonable attorneys' fees and costs; and

5       i.      Any other relief that the Court deems proper.

6 <b><u>COUNT X</u></b>

7 <b><u>BREACH OF CONTRACT</u></b>

8      153.   Plaintiff incorporates by reference each and every allegation set forth above, except

9  paragraph 89, as if fully stated herein.

10      154.   Plaintiff and members of the Class entered into a valid and binding agreement with

11  Defendants Corinthian to provide a quality education and career placement services, in exchange for

12  the payment of money.

13      155.   Defendants failed to perform under the terms of the agreement.  Defendants did not

14  provide Plaintiff and members of the Class with "an array of job placement resources" or connect

15  Plaintiff and the Class to employers with which Defendants had "strong networks," or even past

16  experience hiring Everest graduates.

17      156.   As a result of this breach, Plaintiff and members of the Class have suffered and are

18  entitled to damages, including:

19       a.      General damages;

20       b.      Special damages in an amount according to proof;

21       c.      Reasonable attorneys' fees and costs; and

22       d.      Any other relief that the Court deems proper.

23

24

25

26

27

28

-41-
COMPLAINT FOR CIVIL DAMAGES AND EQUITABLE RELIEF

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

DATED:  April 21, 2011

Respectfully submitted,

By: _____

JASON S. HARTLEY (SBN#192514)
JASON M. LINDNER (SBN# 211451)
STUEVE SIEGEL HANSON LLP
550 West C Street, Suite 610
San Diego, CA 92101
Tel: 619-400-5822
Fax: 619-400-5832
Email:      hartley@stuevesiegel.com
            lindner@stuevesiegel.com


NORMAN E. SIEGEL
(pro hac vice forthcoming)
STUEVE SIEGEL HANSON LLP
460 Nichols Road, Ste. 200
Kansas City, Missouri 64112
Tel:    816-714-7100
Fax:    816-714-7101
Email:        siegel@stuevesiegel.com


JONATHAN K. TYCKO
(pro hac vice forthcoming)
MELANIE WILLIAMSON
(pro hac vice forthcoming)
TYCKO & ZAVAREEI LLP
2000 L Street, N.W., Suite 808
Washington, D.C. 20036
Telephone:    (202) 973-0900
Facsimile:    (202) 973-0950
Email:        jtycko@tzlegal.com
              mwilliamson@tzlegal.com

RANDALL K. SPENCER
(pro hac vice forthcoming)
MATTHEW R. HOWELL
(pro hac vice forthcoming)
FILLMORE SPENCER LLC
3301 North University Avenue
Provo, Utah 84604
Telephone:    (801) 426-8200
Facsimile:    (801) 426-8208
Email:        rspencer@fslaw.com
              mhowell@fslaw.com

-42-

COMPLAINT FOR CIVIL DAMAGES AND EQUITABLE RELIEF

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge A. Howard Matz and the assigned discovery Magistrate Judge is Andrew J. Wistrich.

The case number on all documents filed with the Court should read as follows:

## CV11- 3467 AHM (AJWx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

========================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [ ] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |
|---|---|---|

Failure to file at the proper location will result in your documents being returned to you.

Name & Address:
Jason S. Hartley (192514)
Stueve Siegel Hanson LLP
550 West C Street, Suite 610
San Diego, CA 92101
619-400-5822  hartley@stuevesiegel.com

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

KENNETH STOCKMAN, on behalf of himself and all others similarly situated,

PLAINTIFF(S)

v.

CORINTHIAN SCHOOLS, INC., CORINTHIAN COLLEGES, INC.

DEFENDANT(S).

CASE NUMBER

**CV11-03467 AHM (AJWx)**

**SUMMONS**

TO:   DEFENDANT(S): \_\_ _____

_____

A lawsuit has been filed against you.

Within ___21___ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _Jason S. Hartley_____, whose address is _550 W. C St., Ste. 610, San Diego, CA 92101_____.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: ___APR 22 2011___

By: _____ROLLS ROYCE PASCUAL_____

Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

CV-01A (12/07)                                                                 SUMMONS

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

| | |
|---|---|
| **I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)<br>Kenneth Stockman, individually and on behalf of all others similarly situated | **DEFENDANTS**<br>Corinthian Colleges, Inc. and Corinthian Schools, Inc. |
| **(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing<br>yourself, provide same.)<br>Jason Hartley, Stueve Siegel Hanson, LLP, 550 W. C Street, Suite 610, San<br>Diego, CA 92101 (619) 400-5822 | Attorneys (If Known) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff  ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant  ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☒ Yes  ☐ No   ☒ **MONEY DEMANDED IN COMPLAINT: $** 0.00

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 USC 1332(d)(2); 28 USC 1391; Plaintiffs allege Defendant takes money from consumers by misrepresenting its degree programs

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☒ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Accommodations | | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | **REAL PROPERTY** | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | ☐ 210 Land Condemnation | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | ☐ 220 Foreclosure | **IMMIGRATION** | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 230 Rent Lease & Ejectment | ☐ 462 Naturalization Application | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 240 Torts to Land | ☐ 463 Habeas Corpus-Alien Detainee | | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 245 Tort Product Liability | | | | |
| | ☐ 290 All Other Real Property | | | | |

**FOR OFFICE USE ONLY:**   Case Number:   **CV11-03467 AHM (AJWx)**

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No   ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No   ☑ Yes
If yes, list case number(s): CV11-00127 DOC (AJWx); CV11-00259 CJC (MLGx)

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)   ☑ A. Arise from the same or closely related transactions, happenings, or events; or
                               ☑ B. Call for determination of the same or substantially related or similar questions of law and fact; or
                               ☑ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
                               ☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Kenneth Stockman - Volusia County, Florida |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Corinthian Colleges, Inc. - Orange County<br>Corinthian Schools, Inc. - Orange County | |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County and Los Angeles County | |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved.

**X. SIGNATURE OF ATTORNEY (OR PRO PER):** _____   Date April 19, 2011

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings
or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed
but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |